838 So.2d 771 (2003)
Jennifer Midkiff HUBER,
v.
Alice Siegmund MIDKIFF and Ronald Edward Midkiff.
No. 2002-CA-0664.
Supreme Court of Louisiana.
February 7, 2003.
Rehearing Denied March 21, 2003.
*772 Brett A. Bonin, for Applicant.
Timothy W. Hassinger, Debra M. Kesler, Metairie, for Respondent.
JOHNSON, Justice.
In this case, the district court declared LSA-C.C. art. 136(B) unconstitutional as applied "to the situation where grandparents are attempting to gain the visitation of their grandchild from their own child." Alice and Ronald Midkiff appealed that judgment to this Court pursuant to La. Const. Art. V, § 5(D).

FACTS AND PROCEDURAL HISTORY
The record is replete with highly inflammatory allegations of outrageous conduct by both sides in pleadings and in briefs filed with this Court. There has been no trial on the merits, so there are few facts we can glean as true from the record.
We do know that Jennifer Midkiff married Rodney Huber in January 1997, and Raven Frost Huber was born to that union. Following Rodney's arrest and incarceration, Jennifer filed for divorce. In the divorce proceedings, she was granted sole custody with Rodney having supervised visitation. She later moved in with her parents, Alice and Ronald Midkiff,[1] where they lived for three years. The battle over custody and visitation with Raven began in October 2000, when Jennifer rented her own apartment, and she and Raven moved out.
This action began in the district court as a Petition for Domestic Abuse Protection, filed on November 22, 2000, where Jennifer Huber sought a restraining order *773 against her parents, alleging that they physically and verbally abused, threatened and harassed her. On January 9, 2001, the Midkiffs answered the petition, denying Ms. Huber's allegations, and filed a Reconventional Demand for custody/visitation, suggesting that they had been the primary caregivers for their granddaughter Raven for three out of the five years of her life and that Ms. Huber was angry with them because they had "admonished" her for her "continued disregard" for Raven's well being. Also, in the reconventional demand, the Midkiffs requested the following: 1) joint custody with Ms. Huber, or in the alternative, visitation; 2) the appointment of a mental health evaluator according to LSA-R.S. 9:331;[2] and 3) interim visitation pending the appointment of the evaluator.
The record indicates that the protective order was dismissed on January 17, 2001, and that Judge Craig Cimo, the domestic commissioner for the district court, granted a preliminary injunction against the Midkiffs for six months, preventing them from harassing, contacting, and/or interfering with Ms. Huber's custody of Raven or her employment. The Midkiffs asserted that they voluntarily consented to the six months protective order in exchange for an informal visitation with Raven, which never took place. According to the Midkiffs, Ms. Huber initially requested that a family member or friend supervise the visitation, to which the Midkiffs consented. Then, Ms. Huber requested that she supervise the visitation. The Midkiffs disagreed with this plan. After several unsuccessful attempts to visit with Raven, the Midkiffs filed, on February 12, 2001, an Ex-Parte Motion for Temporary Visitation Pending Hearing; Motion for Expedited Hearing on Rule for Interim Visitation and for Appointment of a Mental Health Professional, alleging that "immediate and irreparable injury has resulted and will continue to result" from Ms. Huber's refusal to allow the Midkiffs to visit with Raven.
On March 5, 2001, Ms. Huber filed Peremptory Exceptions of No Cause of Action and No Right of Action due to the Unconstitutionality of Civil Code article 136(B).[3] *774 In support of the exceptions, Ms. Huber contended that the Midkiffs' claim for custody of Raven should be dismissed as a matter of law because under LSA-C.C. art. 136(B), a non-parent may only petition for visitation and not custody. Ms. Huber also contended that this article is unconstitutional under the Fourteenth Amendment-Due Process Clause (La. Const. art. 1 § 2) and the Louisiana Constitution-Right to Privacy Clause (Art. 1 § 5). In relying upon Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), Ms. Huber argued that LSA-C.C. art. 136(B) was unconstitutional because "it interferes with a parent's fundamental right to raise his child and is not narrowly tailored to serve the compelling state interest of protecting the welfare of minors."
On March 6, 2001, District Judge Kernan A. Hand denied the Midkiffs' request for temporary visitation pending the hearing. On March 28, 2001, the record indicates that a Consent Judgment was read into the record where Ms. Huber consented to allow the Midkiffs one two-hour visitation with Raven.
On May 14, 2001, the district court appointed Gail Pesses, MSW, LCSW, as custody evaluator, ordered all parties to participate in any interview and/or testing conducted by the evaluator, and ordered the evaluator to submit a written report of her findings. Ms. Pesses interviewed Ron and Alice Midkiff, Ms. Huber, Raven, Ms. Huber's fiancé, Steve Creech, Melissa Midkiff and John Midkiff (Jennifer's biological sister and brother) to determine the most appropriate domiciliary and visitation arrangements for Raven. She interviewed with these parties from April 4, 2001 to August 22, 2001, and then prepared a report of her findings. Ms. Pesses summarized her findings and recommendations as follows:
This custody action appears to have everything to do with the dynamics in the extended family and actually little to do with Raven's day to day care.... Jennifer's philosophy of child rearing seems appropriate and reflects her educational level. She expresses a commitment to her child's welfare even under the extreme stress of fighting her own family for her child.... Ron and Alice's insistence that Raven is being harmed by Jennifer has little factual foundation.... The emotional overtones in this custody fight overshadow their ability to be objective in applying their knowledge of how children thrive in the elementary grade classroom to their grandchild's situation.... They did not present any solid evidence that Raven was being mistreated or hurt by her mother and that they could do a better job in raising her....
The central issue here is more likely about control. Ron and Alice, feeling rejected by Jennifer's insistence that she be able to make her own decisions for Raven and for herself, are attempting to regain control in whatever way they can. This includes marshaling the family into taking sides, identifying Gerald Heausler (Jennifer's biological father) as the enemy, harassing Jennifer, Steve, Steve's family as well as sitters for Raven and continually keeping things stirred up to such an extent that the entire family system suffers from the stress and pressure....
As a result, Ms. Pesses recommended that Ms. Huber retain sole custody and the Midkiffs be granted supervised visitations with Raven.[4]
*775 On May 16, 2001, the Midkiffs filed a supplemental and amending Reconventional Demand, requesting sole custody of Raven or, in the alternative, joint custody with Ms. Huber. In response, on May 25, 2001, Ms. Huber filed an Exception of No Cause of Action and Vagueness, asserting that the Midkiffs have no right to custody pursuant to LSA-C.C. art. 133[5] because they failed to prove that the award of sole custody to Ms. Huber would result in substantial harm to Raven. On September 6, 2001, Ms. Huber filed a Rule for Contempt against the Midkiffs, arguing that Alice Midkiff contacted Raven's sitters and harassed them, which violated the temporary restraining order executed in November 2000.
On October 26, 2001, the Midkiffs filed a Motion to Enforce Visitation, alleging that Ms. Huber violated the initial Consent Judgment which allowed them to visit Raven. On November 14, 2001, the Midkiffs filed a memorandum in opposition to Ms. Huber's Exceptions, alleging that grandparents may be granted custody and/or visitation under LSA-C.C. art. 131,[6] et seq.
On November 15, 2001, the district court granted Ms. Huber's Exceptions of Unconstitutionality and No Cause of Action, finding it "unconstitutional to apply LSA-C.C. art. 136(B) to the situation where grandparents are attempting to gain visitation of their grandchild from their own child." In oral reasons for judgment, the district court noted that article 136(B) is found within Title V (Divorce) of the Civil Code, and specifically, within Chapter 2 of that title, addressing provisional and incidental proceedings, and stated:
Therefore, it is clear that Article 136 contemplates a grant of reasonable visitation to relatives upon the divorce of the child's parents, if there are extraordinary circumstances and upon finding by the court that such an award is in the best interest of the child.
It is the opinion of the Court that the legislature, in drafting the provisions of the Civil Code which deal with grandparent visitation, intended for the mandates of Article 136(B) to apply to those situations where the minor child's parents are divorced and the grandparents of the parent without custody are attempting to gain visitation privileges in an effort to keep the extended family of the minor child intact. This Court does not feel that the Legislature intended for Article 136(B) to apply to grandparents attempting to gain visitation of their grandchild from their own child. By allowing this, the legislature and the Court would be overstepping the authority of a parent granted custody of a minor child.

DISCUSSION
In considering the constitutionality of a statute, this jurisprudence recognizes the general presumption of a statute's constitutionality. Brown v. State, Department of Public Safety & Corrections, 96-2204 (La.10/15/96); 680 So.2d *776 1179. The party that challenges the statute's constitutionality carries the burden of proving specific constitutional infirmities. Id. Once the statute's constitutionality is assailed, this Court requires that the attorney general be notified by certified mail of the proceeding and, at his discretion, he shall be allowed to represent the state's interest. Specifically, LSA-R.S. 13:4448 provides that:
Prior to adjudicating the constitutionality of a statute of the state of Louisiana, the courts of appeal and the Supreme Court of Louisiana shall notify the attorney general of the proceeding and afford him an opportunity to be heard. The notice shall be made by certified mail. No judgment shall be rendered without compliance with the provisions of this Section; provided where the attorney general was not notified of the proceeding, the court shall hold adjudication of the case open pending notification of the attorney general as required herein.
In Vallo v. Gayle Oil Co., Inc., 94-1238 (La.11/30/94); 646 So.2d 859, this Court held that the attorney general must be served with a copy of the proceeding and is entitled to represent the state's interest in the proceeding when the constitutionality of a statute is questioned. In Vallo, a claimant bought a workers' compensation action against his employer for failure to pay compensation and medical expenses. In the pre-trial memorandum, the claimant, who underwent surgery at Baylor Medical Center in Dallas, Texas, challenged LSA-R.S. 23:1203(A), which required that all medical services and treatment be performed at facilities within the state of Louisiana when available. The trial court declared that the workers' compensation statute was unconstitutional. Both the claimant and the employer appealed. This Court held that when the constitutionality of a statute is challenged, the Attorney General must be served with a copy of the proceeding and is entitled to be heard and/or, at his discretion, to represent or supervise representation of the state's interest in the proceeding. This Court concluded that the plaintiff's procedure, which resulted in the statute being declared unconstitutional without notifying the Attorney General, unfairly prejudiced the state's and the defendants' interests. Thus, this Court remanded the matter to the trial court for further proceedings.
In Lemire v. New Orleans Public Service, Inc., 458 So.2d 1308 (La.1984), this Court declined to consider the constitutional challenge of whether LSA-C.C.P. art. 1812 barred jury trials against governmental subdivisions when: 1) the statute's constitutionality was not questioned in trial court; 2) the plea of unconstitutionality was not specifically pled in a petition, exception, motion, or answer; and 3) the Attorney General was not served a copy of the pleading which contests the constitutionality of the statute.
Although Louisiana's long-standing jurisprudence requires that a statute's constitutionality be questioned in the trial court and specifically pled and the grounds particularly claimed in a pleading, jurisprudence also mandates that the attorney general be served a copy of the pleading challenging the statute's constitutionality. Chamberlain v. State through the Department of Transportation and Development, 624 So.2d 874 (La.1993);[7]Reeder v. *777 North, 97-0239 (La.1997); 701 So.2d 1291; In Re Medical Review Panel of Harris, 97-1970 (La.App. 1st Cir.9/28/98); 725 So.2d 7; Jeter v. Shamblin, 32,618 (La. App. 2 Cir.2000); 750 So.2d 521.
This challenge to the constitutionality of LSA-C.C. 136(B) is not in the proper posture for this Court's review. There is clearly no evidence in the record to indicate that the Attorney General was served or notified of the challenge to the constitutionality of the statute so that the Attorney General could elect whether or not to exercise his statutory right to represent the state's interest in the proceeding prior to the declaration of unconstitutionality. Specifically, the record demonstrates that at the inception of this matter, Domestic Commissioner Judge Cimo suggested that "since there are some questions of constitutionality,... the Attorney General's office... need to be joined and ... the definitive ruling should come from the district judge, not the commissioner." At that hearing, both attorneys replied that they "understood" the commissioner's ruling. The record also indicates that the order attached to Ms. Huber's Peremptory Exceptions of No Cause of Action and No Right of Action requested that the Midkiffs and the Honorable Richard P. Ieyoub, Attorney General, be served. Although this order was signed by Judge Hand, the word "Moot" was written across the page and the service instruction was crossed out with the note "Do Not Issue per T. Hassinger," (counsel for Ms. Huber) inscribed on it. When this motion was reset, Ms. Huber's attorney failed to request that the Attorney General be served with a copy of the proceeding.
Additionally, prior to signing the final judgment, Judge Hand issued an order holding this matter open for an additional thirty (30) days so that the Attorney General's office would be given appropriate notice to this judgment. Despite the representation by counsel, it is clear that the Attorney General's office was not notified with a copy of this proceeding, which related to the constitutionality of LSA-C.C. art. 136(B). If the Attorney General's office was notified, there is no evidence within the record to substantiate such.
For the above reasons, we find that this constitutional challenge is not properly before this Court according to LSA-R.S. 13:4448. Therefore, the trial court's ruling that LSA-C.C. art. 136(B) is unconstitutional is vacated, and this matter is remanded to the district court to give the Attorney General notice of the issue and an opportunity to exercise his discretion in representing the state's interest. The district court judge was required to make certain that the Attorney General was notified of this matter prior to ordering this family to undergo months of evaluation by a court appointed expert and incurring legal expenses.

DECREE
REVERSED and REMANDED.
WEIMER, J., concurs and assigns reasons.
VICTORY, J., concurs in result.
WEIMER, J., concurring.
I concur in the result, but write separately regarding the following.
The provision at issue, La. C.C. art. 136, provides in pertinent part:
B. Under extraordinary circumstances, a relative, by blood or affinity, or a former stepparent or stepgrandparent, not granted custody of the child may be granted reasonable visitation *778 rights if the court finds that it is in the best interest of the child. In determining the best interest of the child, the court shall consider:
(1) The length and quality of the prior relationship between the child and the relative.
(2) Whether the child is in need of guidance, enlightenment, or tutelage which can best be provided by the relative.
(3) The preference of the child if he is determined to be of sufficient maturity to express a preference.
(4) The willingness of the relative to encourage a close relationship between the child and his parent or parents.
(5) The mental and physical health of the child and the relative.
No trial was conducted in this matter. Thus, we cannot determine from the record whether "extraordinary circumstances" exist or whether reasonable visitation with the grandparents would be "in the best interest of the child."
I do not believe the provision is facially unconstitutional. In Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), in a plurality decision, the United States Supreme Court held the Washington statute unconstitutional because the statute was "breathtakingly broad." This provision is more limited. Additionally, I do not believe the trial court was required to reach the constitutionality of the provision. Dauzat v. East Baton Rouge Parish Metropolitan Council, XXXX-XXXX, p. 4 (La.5/25/01), 785 So.2d 812, 815. If the trial court does not find the existence of "extraordinary circumstances" or finds that the visitation is not "in the best interest of the child," then there is no need to address the constitutionality of the provision.
To avoid any constitutional issues related to Article 136(B) and in recognition of the constitutionally based fundamental right of parents to make decisions concerning the care, custody, and control of their children,[1] I also believe that the "extraordinary circumstances" must be those which are "[a] highly unusual set of facts that are not commonly associated with a particular thing or event." BLACK'S LAW DICTIONARY 236 (7th ed.1999). Not every unique set of circumstances will justify imposing visitation, only those circumstances which are truly extraordinary.
NOTES
[1] Alice is Ms. Huber's biological mother, and Ronald is her adopted father.
[2] LSA-R.S. 9:331 provides that:

A. The court may order an evaluation of a party or the child in a custody or visitation proceeding for good cause shown. The evaluation shall be made by a mental health professional selected by the parties or by the court. The court may render judgment for costs of the evaluation, or any part thereof, against any party or parties, as it may consider equitable.
B. The court may order a party or the child to submit to and cooperate in the evaluation, testing, or interview by the mental health professional. The mental health professional shall provide the court and the parties with a written report. The mental health professional shall serve as the witness of the court, subject to cross-examination by a party.
[3] LSA-C.C. art. 136 provides, in pertinent part, that:

A. A parent not granted custody or joint custody of a child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would not be in the best interest of the child.
B. Under extraordinary circumstances, a relative, by blood or affinity, or a former stepparent or step grandparent, not granted custody of the child may be granted reasonable visitation rights if the court finds that it is in the best interest of the child. In determining the best interest of the child, the court shall consider:
(1) The length and quality of the prior relationship between the child and the relative.
(2) Whether the child is in need of guidance, enlightenment, or tutelage which can best be provided by the relative.
(3) The preference of the child if he is determined to be of sufficient maturity to express a preference.
(4) The willingness of the relative to encourage a close relationship between the child and his parent or parents.
(5) The mental and physical health of the child and the relative.
[4] Specifically, Ms. Pesses recommended that the Midkiffs be awarded supervised visitation on the last Saturday of each month from 10:00 a.m. until 6:00 p.m. and every Wednesday from after school until 8:00 p.m.
[5] LSA-C.C. art. 133 provides that "if an award of joint custody or of sole custody to either parent would result in substantial harm to the child, the court shall award custody to another person with whom the child has been living in a wholesome and stable environment, or otherwise to any other person able to provide an adequate and stable environment."
[6] LSA-C.C. art. 131 provides that "in a proceeding for divorce or thereafter, the court shall award custody of a child in accordance with the best interest of the child."
[7] In Chamberlain, the plaintiffs challenged the constitutionality of LSA-13:5106(B)(1), which imposed a $500,000 cap on general damages recoverable in a personal injury suit against the state. This Court noted that LSA-R.S. 13:4448 requires that the Attorney General be served, and the plaintiffs satisfied this requirement by sending a certified letter to the Attorney General, who exercised his discretion to represent the state in this matter.
[1] Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).