961 So.2d 5 (2007)
Mark and Margaret SHAW
v.
Tonya Renee Shaw DUPUY.
No. 2006 CU 0546.
Court of Appeal of Louisiana, First Circuit.
February 9, 2007.
Writ Denied March 21, 2007.
*6 Michelle Alt Hazlett, Denham Springs, Counsel for Plaintiffs/Appellees Mark and Margaret Shaw.
Leslie A. Burns, Denham Springs, Counsel for Defendant/Appellant Tonya Renee Shaw Dupuy.
Before: WHIPPLE, KUHN, GAIDRY, MCCLENDON, and WELCH, JJ.
KUHN, J.
Tonya Renee Shaw Dupuy, the mother of the minor children, appeals a trial court judgment granting the maternal grandparents, Mark and Margaret Shaw, specific visitation privileges with the children. We reverse.

FACTUAL AND PROCEDURAL HISTORY
Tonya Dupuy is the mother of two children, A.A.S., born March 30, 1989, and B.D.L., born January 7, 1999. The identity and whereabouts of the father of A.A.S. are unknown. The father of B.D.L. is James Lacombe, from whom Ms. Dupuy is now divorced. Mark and Margaret Shaw are the children's maternal grandparents.[1]
On August 30, 2004, the Shaws filed a petition for visitation against their daughter, requesting that they be awarded specific visitation with their daughter's minor children. After a hearing, the trial court rendered judgment awarding the Shaws visitation with A.A.S. and B.D.L. one "weekend" per month from Saturday at 4:00 p.m. until Sunday at 6:00 p.m., and one additional Sunday per month from 9:00 a.m. until 6:00 p.m.; one week during the summer; and one day and one night during the Thanksgiving, Christmas, and Easter holidays. The trial court also specified certain restrictions and requirements for the children during their visitation and ordered all parties to refrain from making negative comments about any other party in the presence of the children. A judgment in conformity with the trial court's rulings was signed, and Ms. Dupuy appeals, challenging the trial court's award of visitation.

DISCUSSION
The trial court is vested with vast discretion in matters of child visitation, and its determination regarding same is entitled to great weight and will not be disturbed on appeal unless an abuse of discretion is clearly shown. Babin v. Babin, 02-0396, p. 7 (La.App. 1st Cir.7/30/03), 854 So.2d 403, 408, writ denied, 2003-2460 (La.9/24/03), 854 So.2d 338, cert. denied, 540 U.S. 1182, 124 S.Ct. 1421, 158 L.Ed.2d 86 (2004).
It is well settled that an appellate court cannot set aside a trial court's findings of fact in the absence of manifest error or unless those findings are clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989). If the findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse those findings even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Id.
*7 In their petition for visitation, the Shaws requested an award of visitation with the children in accordance with La. C.C. art. 136.[2] Ms. Dupuy asserts that the trial court erred in finding the requisite "extraordinary circumstances" required by La. C.C. art. 136B existed.[3]
La. C.C. art. 136B states in pertinent part:
Under extraordinary circumstances, a relative, by blood or affinity, or a former stepparent or stepgrandparent, not granted custody of the child may be granted reasonable visitation rights if the court finds that it is in the best interest of the child.
Louisiana Civil Code article 136(B) requires a threshold finding by the court of "extraordinary circumstances." Although the term has not been defined in the jurisprudence, the "extraordinary circumstances" sufficient to warrant an award of visitation should be those that constitute "[a] highly unusual set of facts . . . not commonly associated with a particular thing or event." See Galjour, 00-2696, p. (La. 1st Cir.3/28/01), 795 So.2d 350, 355; Huber v. Midkiff, 02-0664 at p. 1, 838 So.2d at 778, (Weimer, J., concurring)(quoting BLACK'S LAW DICTIONARY 236 (7th ed.1999)).
The record shows that at the time Ms. Dupuy gave birth to A.A.S., she was an unwed teenager. During her pregnancy, she resided primarily with Margaret Shaw with intermittent stays at the home of her grandmother. After A.A.S.'s birth, Ms. Dupuy continued to reside with her mother, who had taken time off of work to help with A.A.S.
In May 1989, Ms. Dupuy moved into her grandmother's house, where she remained until October 1990. During this time period, Margaret Shaw began dating Mark Shaw. They took occasional trips to visit Mark Shaw's family in Texas, and Ms. Dupuy allowed A.A.S. to go on these trips. In October 1990, Ms. Dupuy moved back into her mother's home, where she resided with Margaret and Mark Shaw. The Shaws subsequently married, and Ms. Dupuy continued to reside with them until March 1993, when she married Scott Jones and moved out of their house. Ms. Dupuy separated from Mr. Jones in February *8 1994, and again returned to the Shaws' home until May 1994.
In the summers of 1994, 1995, 1997, and 1998, the Shaws, Ms. Dupuy, and A.A.S. went on family vacations together. In the late 1990s, Ms. Dupuy purchased a condominium, located about two miles from the Shaws, using money given to her by her parents for a down payment. In June 1998, Ms. Dupuy became pregnant with B.D.L, and married the child's father, Mr. LaCombe.
After a physical altercation between Ms. Dupuy and Mr. LaCombe the night before B.D.L.'s birth, Mark Shaw accompanied his daughter to the hospital, where the Shaws remained with her until after the baby was born. In the spring 1999, Ms. Dupuy and Mr. LaCombe separated.
In 1998, 1999, and 2000, Mark Shaw was an assistant coach for A.A.S.'s ball team. During the 1999-00 and 2000-01 school years, A.A.S. took the bus home from school to the Shaws'. Mark Shaw assisted A.A.S. with her homework and projects after school.
In August 2001, Ms. Dupuy married Brad Dupuy, and they moved to Denham Springs, Louisiana. During the couple's honeymoon, the Shaws watched A.A.S., B.D.L., and B.D. (Mr. Dupuy's child from a prior relationship), taking them to Gulf Shores, Alabama. In June 2002, the Shaws again enjoyed a family vacation with the children.
In 2001, the Shaws started "family night," where the family dined together every week or two. Family nights continued through 2004, although during January 2004 through June 2004, Ms. Dupuy did not participate.
According to the Shaws, A.A.S. and B.D.L. were no longer permitted to visit them beginning in the spring of 2004 because Ms. Dupuy had become upset with the Shaws' participation in a foster parent program. The Shaws opined that Ms. Dupuy did not want to share her inheritance or that of her children with a foster child. They then filed this lawsuit in an effort to resume participation in their granddaughters' lives.
Ms. Dupuy testified that her parents' behavior and actions in front of the children contradicted and interfered with her beliefs and rules, which is why she terminated contact between the grandparents and the grandchildren. As examples, she stated that on numerous occasions they allowed A.A.S. to buy inappropriate clothing, including short shorts and a string bikini, and they permitted her unlimited amounts of unsupervised time on the internet. She is upset that her parents have told A.A.S. they will provide her with a car no matter what Ms. Dupuy says. She also is disturbed that her parents have offered A.A.S. a cell phone even though Ms. Dupuy does not want her daughter to have one until she feels the teenager is ready. Ms. Dupuy also takes issue with her parents' tendency to undermine her authority by telling A.A.S. that they do not understand why Ms. Dupuy imposes restrictions on the teenager's behavior. She recounted that Margaret Shaw showed A.A.S. a picture of Ms. Dupuy in short shorts when she was a younger age than A.A.S. was. Ms. Dupuy feels that her parents' permissive attitude toward her daughters have caused the children to believe that they do not have to respect their mother's decisions. Ms. Dupuy also has problems with her parents' refusal to respect her desire to be the person who disciplines her children. She believes that the Shaws should stop attempting to override her parental authority and defer to her.
Insofar as the Shaws' decision to become foster care parents, Ms. Dupuy testified that she was against it because of concerns *9 for her mother's health, indicating that a prior attempt by the Shaws to care for foster children had left Margaret Shaw seriously depressed. Ms. Dupuy also questioned Margaret Shaw's ability to act as a foster parent. She stated that until the time she turned 18, her mother had not paid enough attention to her, took her places with her boyfriends, drank a lot, and frequently left her alone. Ms. Dupuy denied concerns about losing her inheritance as a result of the presence of foster children in the Shaws' lives but admitted that she told her mother that she had hoped her children would inherit from them. She also acknowledged that she told the Shaws that she would distance herself from them if they chose to participate in the foster care program but said that she did not tell them she would remove the children from their lives. Subsequent to the placement of foster children in the Shaws' care, A.A.S. and B.D.L. accompanied them to Gulf Shores with the Shaws.
Ms. Dupuy described the event that precipitated the termination of the Shaws' visitation with her daughters. She explained that after her daughters, the foster children, and the Shaws returned from Gulf Shores, she was having a conversation with Mark Shaw and he began belittling her. She asked him to leave her house, and when he refused, she told him she would call the police. As she attempted to call the police, he removed the cord from the jack. She moved to another phone in a different room, and Mark Shaw attempted to restrain her. She hit him on his fingers with the cordless phone. Mark Shaw told A.A.S., who was in another room, to pack her bags and that she should leave with him. Ms. Dupuy called the police, but did not pursue charges once A.A.S. was returned to her care.
Although the record demonstrates that the Shaws and Ms. Dupuy and her daughters were a close family who participated in each other's lives in the past, the trial court was presented with divergent views of the basis for the chasm between Ms. Dupuy and her parents, which resulted in the termination of the frequent visitation the Shaws once enjoyed with their grandchildren. Inconsistencies in testimony are ordinarily matters of credibility allotted to the fact finder for resolution. But in this case, accepting only the Shaws' version of the basis for the split between parents and daughter as true, we find that as a matter of law it is insufficient to constitute the "highly unusual set of facts" necessary to amount to the "extraordinary circumstances" justifying interference in a parent's right to make decisions concerning the care, custody, and control of her children. Mindful that the record is devoid of any allegations or proof of the unfitness of the mother, see Flack v. Dickson, 2003-5, p. 5 (La.App. 3d Cir.4/30/03), 843 So.2d 1261, 1264, we find the trial court abused its discretion by awarding visitation of A.A.S. and B.D.L. to the Shaws. The inability of the mother and the grandparents to communicate or agree on many issues or the mother's alleged concern for an encroachment on an inheritance she believes she and her children are entitled to receive from her parents does not amount to the extraordinary circumstances required by Article 136B to support an award of visitation to the relatives not granted custody of the children. Accordingly, the trial court's award of visitation of A.A.S. and B.D.L. to the Shaws is reversed.[4]

*10 DECREE
For these reasons, the trial court's judgment, which awards visitation to the Shaws is reversed. Appeal costs are assessed to Mark and Margaret Shaw.
REVERSED.
WHIPPLE and McCLENDON, JJ. concur and assign reasons.
WELCH, J., dissents with reasons.
WHIPPLE, J., concurring.
Although the majority pretermits discussion of the application of LSA-C.C. art. 136 to these proceedings, I find that, without doubt, LSA-C.C. art. 136 does not afford the Shaws a cause of action for visitation at the very least as to A.A.S. In Troxel v. Granville, 530 U.S. 57, 66, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000), the United States Supreme Court reaffirmed the fundamental right of parents to make decisions concerning the care, custody and control of their children. The Court further found the Washington statute at issue therein to be "breathtakingly broad" and to unconstitutionally infringe upon that constitutional right by "effectively permit[ting] any third party seeking visitation to subject any decision by a parent concerning visitation of the parent's children to state-court review." Troxel, 530 U.S. at 67, 120 S.Ct. at 2061.
In Galjour v. Harris, 2000-2696 (La. App. 1st Cir.3/28/01), 795 So.2d 350, this court, in addressing the constitutionality of LSA-R.S. 9:344 (visitation for the parents of a deceased, interdicted or incarcerated parent), concluded that LSA-R.S. 9:344 was constitutional because it was narrowly drawn in that it was expressly limited to the parents of the deceased or absent parent and it did not contemplate significant intrusion upon the child's relationship with the other parent or interference with that parent's fundamental right to make childrearing decisions.
As this court specifically noted in Troxel, LSA-C.C. art. 136 is located in the Divorce section of the Louisiana Civil Code and "contemplates a grant of reasonable visitation to relatives upon the parties' divorce, if there are extraordinary circumstances and upon a finding by the court that such an award is in the best interest of the child." Galjour, 795 So.2d at 355; see also Lingo v. Kelsay, 94-1038 (La.App. 3rd Cir.3/1/95), 651 So.2d 499.
To apply LSA-C.C. art. 136(B) to visitation issues would, in my opinion, "effectively permit[] any [relative] seeking visitation to subject any decision by a parent concerning visitation of the parent's children to state-court review." Troxel, 530 U.S. at 67, 120 S.Ct. at 2061. Thus, I believe that this would be an unconstitutional application of LSA-C.C. art. 136(B) as to A.A.S., whose parents were never divorced. In my view, the article clearly does not apply to any claim by the Shaws, as A.A.S.'s maternal grandparents herein, where the child's mother has custody and has simply chosen to limit the child's contact with the maternal grandparents. (While Dupuy has not challenged the applicability of LSA-C.C. art. 136 to the Shaws' request for visitation of B.D.L., I find merit to the trial court's statements as quoted in Huber v. Midkiff, XXXX-XXXX (La.2/7/03), 838 So.2d 771, 775, where the trial court therein expressed its opinion that the legislature did not intend for LSA-C.C. art. 136(B) to apply to grandparents attempting *11 to gain visitation of their grandchild from their own child.)
However, even if I were to conclude that the Shaws had any rights afforded to them under LSA-C.C. art. 136(B), I also would conclude that, under the facts presented, the trial court abused its discretion in awarding grandparent visitation to the Shaws. The record demonstrates that while this was a close family who participated in each other's lives, at least in the past, there are no extraordinary circumstances warranting such visitation. Moreover, while A.A.S. had lived with her mother and maternal grandparents when she was very young, Mrs. Shaw acknowledged that A.A.S. had not lived in their household for many years and that B.D.L. had never lived in their household.
Additionally, I am unable to find that such visitation is in the children's best interests. The record demonstrates that the Shaws clearly and repeatedly interfered with Dupuy's rights to make decisions about her children and undermined her authority and relationship with her children. The fact that the trial court felt compelled to include provisions in its judgment that Dupuy should make all major decisions for the children and that the Shaws should refrain from certain actions demonstrates the trial court's own recognition of the Shaws' ongoing interference with Dupuy's right to make decisions for her children.
Moreover, I find the court-ordered visitation with B.D.L. was an abuse of the trial court's discretion and constitutes an overbroad grant of visitation in that it interferes significantly with Dupuy's relationship with that daughter in that she now has physical custody of B.D.L. only one weekend per month.
Given the evidence of the adoptive maternal grandfather's and the biological maternal grandmother's interference and lack of respect for the mother's paramount rights as the parent (and, in particular, the events which required the summoning of the police on one occasion to return A.A.S. to Dupuy), I am unable to find that the judgment is legally proper or substantively in the children's best interests. Instead, I sadly find this case to present the type of circumstances envisioned in Troxel when the Court again rejected state-court interference with parenting decisions.
Given the absence of any allegations or proof of unfitness of the mother, the well-documented inability of the mother and grandparents to communicate or agree on many issues, and some of the disclosures and acts of the grandparents (which I find shocking and inappropriate), the mother's ultimate right and decision to limit or even end contact with the Shaws is legally protected, and must be respected and upheld (regardless of our view of the moral soundness of her reasons for doing so).
For these reasons, I concur in the majority's decision to reverse the trial court's judgment and dismiss the grandparents' petition for visitation.
McCLENDON, J., concurs.
Based on the totality of the facts presented herein, I concur with the result reached by the majority.
WELCH, J., Dissenting.
I respectfully disagree with the majority opinion in this case because the record in this matter clearly demonstrates that there are extraordinary circumstances and that visitation with Mark and Margaret Shaw would be in the best interest of the children.
As the majority notes, at the time Tonya Dupuy gave birth to A.A.S., she was an unwed teenager and resided primarily with her mother. Although she eventually *12 moved out of the Shaw's home, and gave birth to B.D.L., over the years, Tonya Dupuy's unfortunate personal circumstances made it necessary for her to move back to the Shaw's home with her children. And, since Tonya Dupuy was a young, working, single parent, Mark and Margaret Shaw's role in their grandchildren's lives became more that of a parent rather than grandparent. Indeed, the testimony indicated that it was Mark Shaw who coached A.A.S.'s ball team, who was at home to get A.A.S. off of the school bus, and who helped her with her homework and other school projects.
While Mark and Margaret Shaw contend that Tonya Dupuy discontinued allowing A.A.S. and B.D.L. to visit with them because she was upset with their participation in the Department of Social Service's foster parent program, because she did not want to share "her inheritance" or "her children's inheritance" with a foster child, Tonya Dupuy contends that she halted the visitation because the Shaw's behavior and actions in the presence of the children interfered with her ability to parent her children. Although the evidence indicated that since Tonya Dupuy married Brad Dupuy, she has now become more stable and has taken a more active role in parenting her children, there is no doubt that a strong bond has developed between the Shaws and the minor children that were, for the most part, reared in their household.
In concluding that Mark and Margaret Shaw had met their burden of proof under La. C.C. art. 136, the trial court found that Mark and Margaret Shaw demonstrated that they have had a long and lasting relationship with the children, that up until 2004, they had been very active in the children's lives, and Mark and Margaret Shaw have had a positive influence on the children's lives. The trial court also noted that it had never seen a family who had such a close and loving relationship move so far apart from each other as the Shaw family had done. However, in awarding visitation to Mark and Margaret Shaw, the trial court reminded them that they were grandparents and that they were to respect Tonya Dupuy's wishes as the mother, and that they were not to make important decisions for the children.
I agree with the trial court and find these circumstances, where Mark and Margaret Shaw had a long standing relationship with the children, essentially reared at least one of the two children in their home, and willingly accepted a parental role in their grandchildren's lives due to Tonya Dupuy life circumstances, to be extraordinary. This type of situation, i.e. grandparents rearing their grandchildren and grandparents acting in parental roles because of their children's circumstances, arises all too often in today's society. To judicially ignore such an extraordinary circumstance, as the majority does in this case, is a great injustice to the children. I also find the fact that Tonya Dupuy terminated the relationship between the Shaws and the minor children because of her perception that her inheritance would be adversely impacted by the presence of a foster child, to be "highly unusual" parenting behavior, and likewise, an extraordinary circumstance. Accordingly, I find no error in the trial court's determination that extraordinary circumstances exist in this case.
Having determined that "extraordinary circumstances" exist, I also believe that the record demonstrates that visitation with Mark and Margaret Shaw is in the best interest of A.A.S. and B.D.L. Louisiana Civil Code article 136(B)(1)-(5) provides factors for the trial court to use in the "best interest" determination. The first factor, the length and quality of the *13 prior relationship between the child and the relative, is clearly established by this record. It is undisputed that Mark and Margaret Shaw have provided stability for both of the children, and particularly with A.A.S. during her early years. Furthermore, Tonya Dupuy admitted that she wants her children to have a relationship with Mark and Margaret Shaw.
In analyzing the second factor, whether the child is in need of guidance, enlightenment, or tutelage which can best be provided by the relative, the record contains evidence that Mark and Margaret Shaw have taken an active role and have participated in the children's school work, extracurricular activities, and religious upbringing. Additionally, Mark and Margaret Shaw have taken the children on numerous vacations to the beach, Disney World, and Texas.
With regard to the third factor, the preference of the child, although neither A.A.S. nor B.D.L. testified, the testimony elicited from the parties reflect that in the past, both children have anxiously awaited visitation with Mark and Margaret Shaw and that they desire to continue their relationship and visitation with them.
In considering the fourth factor, the willingness of the relative to encourage a close and continuing relationship between the child and his parent or parents, we note that Mark and Margaret Shaw testified that they have always promoted the children's relationship with their mother and have always abided by Tonya Dupuy's wishes with regard to her children when made known to them.
The last factor for consideration in determining the best interest of the child is the health of the child and relative, both mentally and physically. The record reveals no physical or mental health problems with either the children or Mark and Margaret Shaw. Therefore, having considered all of the factors set forth in La. C.C. art. 136(B), I find no error in the trial court's determination that visitation with Mark and Margaret Shaw was in A.A.S. and B.D.L.'s best interest.
Considering the length and quality of the relationship that Mark and Margaret Shaw have had with A.A.S. and B.D.L. and considering the vast discretion given to the trial court, I find a reasonable basis for the trial court's findings that there were extraordinary circumstances in this case and that visitation with Mark and Margaret Shaw was in the children's best interest. Furthermore, considering the fact that the judgment limited Mark and Margaret Shaw's visitation so as not to be a significant intrusion upon the children's relationship with the mother, specifically gave deference to Tonya Dupuy's role as the children's mother, and prohibited Mark and Margaret Shaw from acting in any manner which would diminish Tonya Dupuy's authority over her children or undermine her ability to raise her children, I cannot say that the trial court abused its discretion in awarding visitation to Mark and Margaret Shaw. Accordingly, I would affirm the January 9, 2006 judgment of the trial court
For these reasons, I respectfully dissent.
NOTES
[1] Margaret Shaw is Ms. Dupuy's biological mother. Mark Shaw adopted Ms. Dupuy once she reached the age of majority See La. R.S. 9:461 and La. C.C. art. 214.
[2] The Shaws' petition also asserts entitlement to an award of visitation under La. R.S. 9:344. But La. R.S. 9:344 applies in those instances in which the child of the grandparents seeking visitation has died, or been interdicted or incarcerated. Because Ms. Dupuy has not died, or been interdicted or incarcerated, La. R.S. 9:344 is inapplicable.
[3] Initially we note that in this case, the Shaws are the parents of the mother who has custody of the minor children. Thus, they are grandparents attempting to gain visitation of their grandchildren from their own child. In Huber v. Midkiff, 02-0664 (La.2/7/03), 838 So.2d 771, 775, the supreme court reversed the trial court's declaration that Article 136B was an unconstitutional due process violation of the custodian's rights to parent the children as applied to the situation before the court. In Huber, the grandparents attempted to gain the visitation of their grandchild from their own child, reasoning that the challenge to the statute's constitutionality had not been questioned in the trial court or specifically pleaded. Likewise in this case, the issue of whether application of Article 136B to the Shaws' claim for visitation of their grandchildren from their own child unconstitutionally infringes upon Ms. Dupuy's right to make decisions concerning the care, custody, and control of her children, see Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), has not been properly postured for disposition by this court. Thus, for purposes of this appeal, we assume without passing judgment that the application of Article 136B to the Shaws' claim for visitation of their grandchildren from their daughter is constitutional. See Huber, 02-0664 at p. 6, 838 So.2d at 775-76.
[4] Having concluded that the record fails to establish "extraordinary circumstances" sufficient to warrant an award of visitation in favor of the Shaws under Article 136B, we find it unnecessary to address Ms. Dupuy's contention that a proceeding for divorce between the parents of the child is a pre-requisite to an action for visitation of the child under that statute. Thus, a discussion on whether Article 136B is applicable to the Shaws' claim for visitation since Ms. Dupuy never married A.A.S.'s father and, therefore, never divorced from him is pretermitted.