854 So.2d 403 (2003)
Leo Joseph BABIN, Jr.
v.
Shirley Ann Schilling BABIN.
No. 2002 CA 0396.
Court of Appeal of Louisiana, First Circuit.
July 30, 2003.
Writ Denied September 24, 2003.
*404 Michael R. Hubbell, Baton Rouge, for Plaintiff-Appellant Leo Joseph Babin, Jr.
Lisa M. Prater, Baton Rouge, for Defendant-Appellee Sylvia Darce.
Before: FITZSIMMONS, GUIDRY, and PETTIGREW, JJ.
PETTIGREW, J.
In this case, plaintiff seeks review of a judgment whereby the trial court granted visitation to the maternal grandmother, allowing her to spend four hours every three weeks with her deceased daughter's minor children. For the reasons that follow, we affirm.

*405 FACTS AND PROCEDURAL HISTORY
Shirley Ann Schilling Babin ("Shirley") and Leo Joseph Babin, Jr. ("Leo") were married on May 9, 1981. In 1988, Leo and Shirley adopted one child, Michelle Lynn Babin ("Michelle"), who was born on March 14, 1988. Leo Joseph Babin, III ("Joey") was born of the marriage on September 19, 1994. In December 1997, Leo filed for divorce, and the parties entered into a stipulation as to various ancillary matters. The parties agreed to joint custody of the children, with Shirley being designated as the domiciliary parent. Leo and Shirley were later divorced in July 1998. During the parties' separation and after the divorce, Michelle and Joey remained in Shirley's custody, with Leo exercising reasonable visitation.
According to the record, Shirley had a long history of severe health problems, including two kidney transplants, liver failure, heart problems, and numerous hospitalizations and surgeries. As a result of these health problems, Shirley developed an addiction to prescription drugs, requiring treatment on several different occasions at both in-patient and out-patient treatment facilities. On May 15, 2000, Shirley passed away. Immediately following Shirley's death, Leo assumed sole physical custody of his children.
On March 21, 2001, Sylvia Darce, Michelle and Joey's maternal grandmother, filed a rule to establish grandparent visitation, seeking to maintain the "close and loving relationship" she had with her grandchildren prior to Shirley's death. According to Sylvia's petition, she had been unsuccessful in her attempts to negotiate a visitation schedule with Leo, who, in Sylvia's opinion, was doing everything possible to "demean her relationship with her grandchildren." Sylvia requested "reasonable visitation" with her grandchildren pursuant to La. R.S. 9:344.
Leo filed an answer to Sylvia's petition for grandparent visitation, including in same exceptions raising the objection of no cause of action based on (1) the unconstitutionality of La. R.S. 9:344, on its face and as applied to the facts of this case, and (2) Sylvia's failure to make an allegation of "serious circumstances" sufficient for the state to exercise its parens patriae power by intervening in the parent-child relationship. The matter proceeded to trial on June 25 and 27, 2001, at which time the court ruled on the constitutional issue, denying Leo's no cause of action exception based on the facial unconstitutionality of La. R.S. 9:344. The court pretermitted ruling on Leo's exceptions based on the constitutionality of La. R.S. 9:344 as applied to the facts of the case and based on the failure to allege "serious circumstances."
After two days of trial, the matter was held over until September 24 and 26, 2001, for the introduction of further testimony. Prior to the trial resuming on September 24, 2001, Leo filed a motion for involuntary dismissal, which was denied as premature. Moreover, on September 24, 2001, the court issued written reasons for judgment, denying Leo's objection of no cause of action based on the failure to allege "serious circumstances." The court found that Sylvia was not required, either by statute or jurisprudence, to allege or prove "serious circumstances" in order to prevail in her rule for grandparent visitation. The court also ruled on the appropriate burden of proof required in this case, noting that Sylvia was required to prove, by a preponderance of the evidence, that visitation would be in the best interest of the children.
During the four-day trial of this matter, the trial court considered documentary evidence *406 and the testimony of numerous witnesses in deciding what was in the best interest of Michelle and Joey relative to Sylvia's request for grandparent visitation. Sylvia testified at length concerning her involvement in her grandchildren's lives both before and after Shirley's death in 2000. When asked about her relationship with Michelle and Joey before Shirley and Leo separated, Sylvia responded, "I was a grandmother to them. I loved them. We did things together. I was a part of their life." Shirley indicated that during that time, she was enjoying retirement and was able to spend a lot of time with the children. When Shirley and Leo separated in 1997, Sylvia testified that she spent as much time as possible with the children. Although she had returned to work at that time, she would check in with Shirley and the children daily to be sure that things were taken care of. Sylvia indicated that in addition to taking care of things around the house like cooking, cleaning, and laundry, she would also spend time with the children shopping, going to church, and playing games.
After Shirley's death in May 2000, the children began living with Leo. Although Sylvia and other members of Shirley's family were initially allowed open and liberal visitation with the children, this changed several months later when Leo began to place restrictions on the visitation. Sylvia described a very strained relationship with Leo during this time and indicated that her visitation with the children, which became very limited, took place only at Leo's home and under his supervision. Sylvia was not allowed any overnight visitation and was told not to call the children. In fact, Sylvia testified that her phone number was blocked on Leo's home phone such that she could not even contact Leo without calling him at work. Sylvia also testified about a letter Leo sent her outlining, as she described it, "all [her] misguidings, all [her] faults, how bad of a time he had with Shirley and how [Sylvia had] influenced Michelle for 12 years." According to Sylvia, this change in Leo's attitude was due largely in part to the fact that Shirley's last will and testament named her sister and brother-in-law, Debbie and Glen Smith, as beneficiaries to an IRA and life insurance policy, the only real assets left by Shirley at her death. Shirley's will also established a trust for Michelle and Joey, with Debbie Smith named as trustee.
Leo testified that initially following his divorce from Shirley, he had liberal visitation with the children and would see them every other weekend. However, according to Leo, as time progressed, Michelle stopped visiting with him on a regular basis. When Shirley's health began to deteriorate, Leo indicated he was concerned that Shirley could not handle the demands of raising the children. He would often talk to Shirley and Sylvia about the children coming to live with him. Leo stated he even considered filing for custody of the children but ultimately did not because he believed it would "destroy" Shirley as the children were "keeping her alive."
Following Shirley's death, the children began living with Leo, but visitation with Shirley's family was "open." Leo indicated this "open" visitation continued through July, when things between he and Sylvia and Debbie became "uncomfortable." According to Leo, he was concerned about his children's financial future and continually asked Debbie for a copy of Shirley's will. Leo eventually retained the services of a lawyer and was able to secure a copy of the will.[1] Noting that problems escalated *407 concerning the money Shirley left for the children, Leo described a strained relationship with Shirley's family. Leo believed Sylvia and Debbie were using the money to "drive a wedge between [him] and [his] children."
Leo stated that when the children would return from visitation with Sylvia, they were both "very undisciplined." He began placing restrictions on Sylvia's visitation with the children in September 2000. Leo testified about a letter he sent in September 2000, to Sylvia, Debbie and Glenn Smith, and Lorraine Andresen-McCormick, the succession attorney. He described the letter as "outlining a number of concerns [he] had having to do with the children's spiritual values, the way they were raised, the way they were disciplined, the things that happened to Shirley that they were exposed to, things that [he] felt needed explanation, the fact that the money was not in a trust." When asked what conditions he placed on the visitation at that point, Leo responded:
I said okay, for now the phone will stay blocked. For now, it will be one person at a time. For now, Sylvia will be the person and you may call me at work and let me know when you'll be by. You're to bring no gifts and no money. You're to visit with Joey and Michelle by talking and playing with them, going to their rooms, let them show you stuff, ask them about school, find games to play or projects to work on.
Leo indicated Sylvia visited with the children two or three times after this letter, but visitation was completely stopped in November 2000. Asked what his reasons were for terminating Sylvia's visitation rights, Leo stated, "She puts her own concerns ahead of others."
Leo's September 20, 2000 letter, which spans over thirty pages, was introduced into evidence for the trial court's consideration. Noting that he is the "parent, guardian and natural tutor" of his children, Leo stated in this letter that Debbie should "have been honest and forthcoming about the fate of Shirley's estate by informing [him] as to what would happen regarding [his] children's financial future." Leo continued, adding that Debbie's "reluctance to disclose information pertinent to [his] children's future, has set a belligerent and non-cooperative tone to these proceedings."
After considering all of the evidence introduced in this case, the trial court rendered oral reasons for judgment, finding visitation with Sylvia to be in the best interest of the children. The court ordered both Sylvia and Leo to attend counseling with Dr. Allen Taylor and granted Sylvia visitation with the children to start out at four hours every three weeks, working around the children's schedules. The court further noted that any variation in this visitation schedule would depend on recommendations made by Dr. Taylor. A judgment in accordance with these findings was signed by the trial court on October 25, 2001.
It is from this judgment that Leo has appealed, assigning the following specifications of error:[2]

*408 1. The trial court erred as a matter of constitutional law in its application of the Louisiana Grandparent Visitation Statute (La. R.S. 9:344(A)) by refusing to require a threshold showing of "serious circumstances" to justify the court's intervention in the parent/child relationship with consideration to Appellant's constitutionally protected fundamental right of privacy.
2. The trial court erred as a matter of constitutional law in its application of the Louisiana Grandparent Visitation Statute (La. R.S. 9:344(A)) by refusing to require a clear and convincing burden of proof of (i) "serious circumstances" sufficient to justify the court's intervention in the parent/child relationship and (ii) that such visitation is in the best interest of the children, in light of Appellant's constitutionally protected fundamental right of privacy.

STANDARD OF REVIEW
Every child custody case must be viewed in light of its own particular set of facts. Dettman v. Rablee, XXXX-XXXX, p. 5 (La.App. 1 Cir. 9/28/01), 809 So.2d 373, 377. The trial court is in the best position to ascertain the best interest of the child given each unique set of circumstances. Bercegeay v. Bercegeay, 96-0516, p. 5 (La. App. 1 Cir. 2/14/97), 689 So.2d 674, 676. The trial court is vested with vast discretion in matters of child custody and visitation. Accordingly, its determination regarding same is entitled to great weight and will not be disturbed on appeal unless an abuse of discretion is clearly shown. Stephens v. Stephens, XXXX-XXXX, p. 4 (La. App. 1 Cir. 6/21/02), 822 So.2d 770, 774.
In the instant case, as in most custody cases, the trial court's determination was based heavily on factual findings. As an appellate court, we cannot set aside the trial court's factual findings unless we determine that there is no reasonable factual basis for the findings and the findings are clearly wrong (manifestly erroneous). Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). If the findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Furthermore, when factual findings are based on the credibility of witnesses, the fact finder's decision to credit a witness's testimony must be given "great deference" by the appellate court. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Thus, when there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, although the appellate court may feel its own evaluations and inferences are as reasonable. Id.

DISCUSSION
Relying on the Supreme Court's decision in Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), Leo challenges the constitutionality of La. R.S. 9:344 and argues that clear and convincing evidence of "serious circumstances" must be presented before grandparent visitation can be awarded. As is discussed more fully below, this court has previously concluded that La. R.S. 9:344 does not violate the constitutional protections afforded parents. Moreover, we agree with the trial court that Sylvia was not required to allege or prove "serious circumstances" in order to prevail in her *409 rule for grandparent visitation pursuant to La. R.S. 9:344. Accordingly, we find no merit to Leo's arguments on appeal.
Recently, in Wood v. Wood, XXXX-XXXX, pp. 4-6 (La.App. 1 Cir. 9/27/02), 835 So.2d 568, 571-572, writ denied, 2002-2514 (La.3/28/03), 840 So.2d 565, this court addressed the Supreme Court's holding in Troxel:
In Troxel, the Supreme Court recognized that one of the byproducts of the changing infrastructure of society at large, and the family unit in particular, is an accommodation in the law for extending visitation to nonparents. While recognizing many benefits of this practice, the Supreme Court rejected any visitation scheme that trampled upon the sacred and paramount rights of a fit parent to dictate the best interests of his or her children. Troxel, 530 U.S. at 63-67, 120 S.Ct. at 2059-61.
Specifically, Troxel involved a request by paternal grandparents, following the death of their son, for visitation with two granddaughters born of the relationship between their son and a companion whom he never married. Troxel, 530 U.S. at 60, 120 S.Ct. at 2057. The girls' mother did not oppose all visitation, but objected to the amount sought by the Troxels. Troxel, 530 U.S. at 61, 120 S.Ct. at 2058. The Troxels' request for visitation was made under authority of a Washington statute. The statute provided that: "Any person may petition the court for visitation rights at any time including, but not limited to, custody proceedings. The court may order visitation rights for any person when visitation may serve the best interest of the child whether or not there has been any change of circumstances." Troxel, 530 U.S. at 61-62, 120 S.Ct. at 2057-8. The United States Supreme Court found the Washington statute "breathtakingly broad" and declared it unconstitutional as applied. Troxel, 530 U.S. at 67 & 73, 120 S.Ct. at 2060-61 & 2064. In doing so, the justices placed particular emphasis upon parents' constitutionally protected fundamental right to make decisions concerning their children, the presumption that parents act in the best interest of their children, and the failure of the Washington statute or court to give some "material" or "special" weight to the parent's own determination on the issue of visitation. Troxel, 530 U.S. at 65-72, 120 S.Ct. at 2060-63. The Supreme Court noted that the contested statute rendered a custodial parent effectively voiceless in deciding what is in the child's best interest, while simultaneously extending unfettered discretion to the trial judge to make such a determination. In the opinion of the Troxel court, the Washington statute allowed the trial judge to "disregard and overturn any decision by a fit custodial parent concerning visitation whenever a third party affected by the decision files a visitation petition, based solely on the judge's determination of the child's best interests." Troxel, 530 U.S. at 67, 120 S.Ct. at 2061.
Subsequent to the Troxel decision, this court confronted the issue of nonparent visitation in the context of Louisiana's two controlling provisions; i.e., La. Civ.Code art. 136 [3] and La. R.S. 9:344. In Galjour v. Harris, 2000-2696, p. 9 (La.App. 1 Cir. *410 3/28/01), 795 So.2d 350, 356, writs denied, XXXX-XXXX, XXXX-XXXX (La.6/1/01), 793 So.2d 1229, 1230, cert. denied, 534 U.S. 1020, 122 S.Ct. 545, 151 L.Ed.2d 422 (2001), one of the issues raised was the constitutionality of La. R.S. 9:344, which provides, in pertinent part, as follows:
A. If one of the parties to a marriage dies, is interdicted, or incarcerated, and there is a minor child or children of such marriage, the parents of the deceased, interdicted, or incarcerated party without custody of such minor child or children may have reasonable visitation rights to the child or children of the marriage during their minority, if the court in its discretion finds that such visitation rights would be in the best interest of the child or children. [Emphasis added.]
In upholding the constitutionality of La. R.S. 9:344, this court concluded that the Louisiana statute was more narrowly drawn than the Washington statute at issue in Troxel and did not violate due process.
The Louisiana legislature has determined that in specified, limited situations, i.e., where one parent dies, is interdicted, or incarcerated, the parents of the deceased, interdicted, or incarcerated party may have reasonable visitation rights with the children provided the court finds said visitation to be in the best interest of the child. Unlike the Washington statute, the Louisiana legislature expressly limited the scope of La. R.S. 9:344 to the parents of the deceased or absent parent. Additionally, the statute's grant of visitation does not contemplate a significant intrusion upon the child's relationship with the other parent or interference with said parent's fundamental right to make childrearing decisions.
Galjour, 2000-2696 at 11, 795 So.2d at 358 (emphasis in original).
In Galjour, this court recognized that the legislature eliminated the burden of showing "extraordinary circumstances," as is required under La. Civ.Code art. 136(B), when the non-custodial parent is dead, interdicted, or incarcerated. Galjour, 2000-2696 at 7, 795 So.2d at 355. In essence, the legislature made the determination, rather than the court, that the death, interdiction, or incarceration of a parent qualified as "extraordinary circumstances." Although the nonparent is relieved of one burden, the nonparent must nevertheless show that the requested visitation is "reasonable" and in the "best interest" of the children. La. R.S. 9:344(A).
Moreover, with regard to the application of La. R.S. 9:344, this court has held there must be a balancing between the provisions of state laws and the constitutional protections afforded parents.
When granting or modifying visitation to a nonparent, the trial court must exercise care not to apply either Civil Code art. 136 or La. R.S. 9:344 in a vacuum. Instead, the trial judge must balance these state provisions against a fit parent's constitutionally protected fundamental right of privacy in child rearing, and remember that any rights of nonparents are ancillary to that of a fit parent. Troxel, 530 U.S. at 65-73, 120 S.Ct. at 2060-64; Reinhardt v. Reinhardt, 97-1889, p. 5 (La.App. 1 Cir. 9/25/98), 720 So.2d 78, 80, writ denied, 98-2697 (La.12/18/98), 734 So.2d 635, cert. denied, 526 U.S. 1114, 119 S.Ct. 1761, 143 L.Ed.2d 792 (1999). The burden of proof is properly placed on the mover, the nonparent, to meet the legislative best interest requirement. It is the court's responsibility to balance state requirements with constitutional protections. In considering the best interest *411 of the child, the trial court must be aware that as nonparent visitation increases, the infringement and burden on the parent's fundamental right of privacy in child rearing increases proportionally. Visitation that unduly burdens parental rights would be unconstitutional, regardless of the provisions of statutory law. [Reinhardt, 97-1889 at 5, 720 So.2d at 80.]
Wood, XXXX-XXXX at 8-9, 835 So.2d at 573.
In granting visitation to Sylvia in the instant case, the trial court offered the following oral reasons for judgment:
The reason I say visitation is in the best interest of the children is because I want them to have a continuity with the family. I want them to know their grandmother. I want them to know their mom through the grandmother and that is a very positive burden that's put on you. It is not a negative burden. It will only undermine this entire process if you diminish Mr. Babin's authority, if you cut him down or belittle him in front of the children. That is not the point of my ordering this visitation.
Because of what's happened in the past, it's very obvious that the visitationand I do think and I know that you said no, Mr. Babin, but I do think that the money triggered all of this. I don't think that it's a coincidence that the visitation cut off in August and your letter to Ms. Andresen-McCormick came in September, and I've looked through the entire document ... and it just comes through loud and clear that the money was the trigger. It may very well be and this is pretty much my take on it, that the money was the last straw to you; that you saw that as the family was just going to run it their way and they were taking the money and they were going to do with the money what they wanted to do and you saw that as the final straw. That may be how it went, but in any event, it was the money.
With that said, visitation with the minor children has to start slowly because I'm ordering counseling and therapy for each of you. It has to be for the best interest of the children since my goal is to have these children have what is best for them. It's obvious to me it's not going to happen without some type of counseling....
Visitation starts off at four hours. It can increase as Dr. Taylor recommends. My goal would be to be at an overnight visitation within six months with the grandparents. The four hours at this point ... would be every three weeks. It would be on a weekend ... [and] around the children's schedule ....
We have thoroughly reviewed the testimony in the record and the documentary evidence introduced by the parties in the instant case. The standard of review requires that great deference be given to the trier of fact's findings when those findings are based on determinations regarding credibility of witnesses. Rosell, 549 So.2d at 844. Based on the extensive testimony from Sylvia regarding the length and quality of the relationship she enjoyed with her grandchildren prior to Shirley's death, and considering the vast discretion given to the trial court, we cannot say the trial court abused its discretion in awarding visitation to Sylvia.[4] The trial court was careful to *412 limit the visitation so as not to be a significant intrusion upon the children's relationship with their father. Moreover, the court was adamant that Sylvia not do anything to diminish Leo's authority over the children or undermine his ability to raise the children as he sees fit. Under these circumstances, we do not find that the trial court erred in its determination that visitation with Sylvia was in the children's best interest. Leo's arguments to the contrary are without merit.

CONCLUSION
For the above and foregoing reasons, the judgment of the trial court is affirmed. All costs associated with this appeal are assessed against plaintiff/appellant, Leo Joseph Babin, Jr.
AFFIRMED.
FITZSIMMONS, J., concurs, and assigns reasons.
GUIDRY, J., concurs in the result.
FITZSIMMONS, Judge, concurring, with reasons.
This is not a dispute between two parents who have an equal right to decide how the child will be raised. The parents' right to make decisions, such as who the child will see or where the child will live, is a fundamental right protected by the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution. Troxel v. Granville, 530 U.S. 57, 65-66 & 72-73, 120 S.Ct. 2054, 2060 & 2064, 147 L.Ed.2d 49 (2000). Before a parent's right to choose his children's visitors can be infringed, Louisiana Revised Statutes 9:344 A requires a "best interest" analysis. If visitation is granted to extended family, it must be "reasonable" and not overly intrusive of the parent's right to make decisions for his child. La. R.S. 9:344 A; Wood v. Wood, XXXX-XXXX, pp. 8-9 (La.App. 1 Cir. 9/27/02), 835 So.2d 568, 573, writ denied, 2002-2514 (La.3/28/03), 840 So.2d 565. Although the factors listed in Civil Code articles 134 and 136 may be helpful in conducting a "best interest" analysis, the trial court must conduct the analysis in light of the constitutional protections enunciated by the United States Supreme Court in Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).
Parents, not grandparents, are entitled to a presumption that they act in the "best interest" of their children. Troxel, 530 U.S. 57, 68, 120 S.Ct. 2054, 2061, 147 L.Ed.2d 49 (2000). If a parent provides reasonable care for his child, "there will normally be no reason for the State to inject itself into the private realm of the family ... concerning the rearing of that parent's children." Troxel, 530 U.S. at 68-69, 120 S.Ct. at 2061. Thus, in deciding whether grandparent visitation is in the "best interest" of the child, the trial court must afford the objection of the parent "special weight." Troxel, 530 U.S. at 70, 120 S.Ct. at 2062. Perhaps more importantly, a finding by the trial court that grandparent or extended family visitation is simply a "better" decision, than the decision of the parent to object, is not constitutionally valid. Troxel, 530 U.S. at 72-73, 120 S.Ct. at 2064.
For these reasons, I believe that the grandmother's burden was to overcome the presumption in favor of the parent's objection to visitation and show why the visitation was in the best interest of the children. From my review of this particular record, in light of the constitutional mandates of Troxel, I find this case to be a very close call. However, after considering *413 the particular circumstances: the death of the mother, the established relationship of the grandmother with the children, and the trial court's findings concerning some of the father's motives for objecting, I respectfully agree with the result. My hesitation stems from my belief that this court, as an instrument of the State, must exercise restraint before interfering in child rearing decisions by parents. Of particular concern here is the trial court's plan, despite a strong parental objection, for future substantial increases in visitation based on the report of a psychologist. In my opinion, extended visitation under the facts here would be overly intrusive and could not pass constitutional muster.
Emotionally, most would agree with the trial court that family continuity is better for a child and believe that extended family can enrich a child's life. However, we also would not hesitate to recognize a parent's right to move to another state with his children; a decision that would also interrupt family continuity. The parent's decision on who his child may visit, including extended family, stems from the same parental right as the decision to move or to choose a particular school. Though painful to the grandparent and the child, that authority should not be infringed by the State based solely on the trial court's belief in the benefits of an extended family and that visitation is a "better" decision for the child. More must be required as a basis for a grant of visitation in the face of an objection by a fit parent, and limited visitation must be the standard.
Finally, I raise the question of the validity of requiring parents to undergo intrusive counseling whenever a third party seeks to force visitation upon a non-consenting parent. Admittedly, the trial court sees from the pinnacle view. However, in the absence of a troubled child or family, I fear that automatic orders of counseling or testing for the parent impinges upon, or even has a chilling effect on, the parent's right to make child rearing decisions. If the third party has the burden of proof, should not a prima facie showing be a threshold requirement before the parent must undergo psychological testing? Without good cause, such testing may impermissibly impinge upon not only the parent's fundamental right to raise his child, but also on the parent's own right to privacy.
NOTES
[1] Although not an issue before us now, we note from the record that Leo initiated a succession proceeding involving Shirley's estate, making various accusations about Debbie's Smith's management of the succession.
[2] Leo also assigns error to the trial court's denial of his peremptory exception raising the objection of no cause of action and his motion for involuntary dismissal. The judgments denying both of these requests are interlocutory in nature and generally not appealable. However, when an unrestricted appeal is taken from a final judgment, the appellant is entitled to seek review of all adverse interlocutory rulings prejudicial to him, in addition to the review of the final judgment. See Landry v. Leonard J. Chabert Medical Center, XXXX-XXXX, p. 5 n.4 (La.App. 1 Cir. 5/14/03), ___ So.2d ___, n. 4, 2003 WL 21087973. Nonetheless, having found no merit to Leo's argument concerning these judgments, and for the reasons set forth more fully below, no further discussion of same is warranted.
[3] Louisiana Civil Code article 136 provides, in pertinent part, for visitation by nonparents as follows:

B. Under extraordinary circumstances, a relative, by blood or affinity, or a former stepparent or stepgrandparent, not granted custody of the child may be granted reasonable visitation rights if the court finds that it is in the best interest of the child....
[4] Sylvia alleges in brief that shortly after the trial court rendered judgment in this case, Leo relinquished his parental rights as to Michelle to Michelle's biological mother. There was also mention of same by Sylvia's counsel during oral arguments before this court. The record is void of any evidence to support this allegation. We note, however, that if Leo has taken this action with regard to his parental rights as to Michelle, then Michelle's biological mother becomes an indispensable party to this action. Thus, Sylvia may need to pursue further legal action to secure any future visitation with Michelle.