JOAN BERNARD ARMSTRONG, Chief Judge.
 

 11 Darryl J. Thomas appeals from the judgment of the trial court granting plaintiff, Shirley Garner, rights of monthly visitation with her grandsons, DTJ
 
 [1]
 
 and MT.
 

 
 *785
 
 The basic facts are not disputed. The plaintiffs daughter, Skekita Garner Thomas, died on June 23, 2005. At the time of her death, Mrs. Thomas was married and living with her husband, the defendant herein, and the couple’s two minor children born of the marriage; DTJ and MT. At the time of the hearing in the trial court, DTJ was thirteen years old and MT was four years old. It is also undisputed that Mrs. Thomas’ parents enjoyed a close and loving relationship with the children prior to her death.
 

 Thereafter, Mrs. Garner filed a Petition for Grandparent Visitation in Civil District Court for the Parish of Orleans, the domicile of Mr. Thomas, DTJ and MT. According to the petition, following Mrs. Thomas’ death, Mrs. Garner was denied access to the children, and was forced to institute proceedings in the Family Court |2of East Baton Rouge Parish
 
 [2]
 
 , where the Thomas family was residing temporarily in the aftermath of Hurricane Katrina. The parties entered into a consent order providing for visitation for two years, following which the matter, if not resolved amicably by the parties, would be taken up in Orleans Parish. Mrs. Garner alleged that despite her good faith efforts, she has not been successful in arranging for visitation with her grandsons.
 
 [3]
 

 The trial court heard Mrs. Garner’s Rule for Grandparent Visitation on September 9, 2008. Mrs. Garner’s uncontro-verted testimony established her relationship to the minor children, and the fact that their mother died in June of 2005. Mrs. Garner has been married to Thomas Garner for forty-two years, and is a retired state employee. Her husband is currently employed. Prior to her daughter’s death, Mrs. Garner had a good relationship with the boys, and exchanged visits with them as a family. Mr. Thomas never registered an objection or complaint to her contact with the children. She often kept the children and prepared meals for them during her daughter’s terminal illness, again without objection from Mr. Thomas. Following Mrs. Thomas’ death, Mr. Thomas denied Mrs. Garner visitation with the children. Mrs. Garner denied having any personal dispute with Mr. Thomas and was unaware of his reason for terminating her visits with the children. Mr. and Mrs. Garner live alone in their home, in a gated community, where, she testified, there had been no criminal activity or drug use.
 

 IsFollowing the court action in East Baton Rouge Parish, the parties agreed to the grandparents’ visitation, and Mrs. Garner testified that she and her husband availed themselves of all the agreed-to visits, including overnight visits. Mrs. Garner testified that she took the children to lunch, had meals with them at home, took them shopping and to Celebration Station, and described the visits as “good times.” The boys demonstrated no reluctance to stay with her, and did not ask to be returned home. Most of the visitations involved only Mr. and Mrs. Garner, although on occasion other family member visited from out of state. Mrs. Garner testified that on one occasion, when the older child was at her home, trying to reach the sibling with a toy, slipped and received a little scratch near his eye. Mrs. Garner advised
 
 *786
 
 Mr. Thomas of the accident, who then spoke with the child. Mr. Thomas did not complain to Mrs. Garner as a result of the child’s injury.
 

 Mrs. Garner told the trial court that she would like to see the boys every month, to spend time with them, do things for them and help to rear them. She testified that she enjoyed being with them. She agreed to supply all necessary transportation and noted that she had a baby seat in her car. She said she would be willing to pick up the boys on Saturday morning at approximately ten o’clock in the morning, and return them on Sunday at six o’clock in the evening. She agreed to facilitate fully all of the boys’ activities, including sports and academic activities, and to take the children to Church each Sunday. She also agreed to contact Mr. Thomas immediately should the children suffer an injury or illness. She testified [¿that she and her husband were in good health and there was no reason why they would not be good and suitable guardians for the children during the visitations.
 

 On cross-examination, Mrs. Garner testified that she visited with the children regularly, approximately every other weekend, or every other month, prior to her daughter’s death. When the children visit, Mr. and Mrs. Garner sleep on a sofa bed and the two boys sleep in the king-sized bed. Mrs. Garner testified that she treated with Neosporin the child’s scratch to which she referred in her direct testimony, but did not seek medical treatment. She also testified to a time when Mr. Thomas brought the baby to their home. The baby seemed sick, so she took him to Our Lady of the Lake hospital, where the baby was treated for a stomach virus. She followed the doctor’s instructions for follow-up care and provided those instructions to Mr. Thomas. Mr. Thomas asked if he needed to come for the baby, and Mrs. Garner told him that would not be necessary. When questioned about the meaning of her testimony that she helped rear the boys, Mrs. Garner testified that she took care of them when Mr. and Mrs. Thomas went on vacation, that she used to go to their home where they would cook and feed the children together. Also, if her daughter had to go to a meeting, sometimes she would leave the children with Mrs. Garner. She denied knowledge of any Social Services complaint registered against Mr. Thomas regarding his care of his children.
 

 Mr. Garner testified, confirming his wife’s testimony concerning their marriage, their daughter’s death and his relationship with his grandchildren. He is a foreman for Grady Crawford Construction, and has been a manager since 2001. [BHe testified that he loves his grandchildren “with every fiber in my body — and they love me and my wife.”
 
 [4]
 
 He denied having experienced any problems during the children’s visits, and confirmed his wife’s testimony that Mr. Thomas never complained about their care of the boys. He testified further that as long as he knew Mr. Thomas, the two had never had any “cross words.” He knew of no conditions in his home that would be detrimental to the children, and testified that he would be willing to continue to facilitate good family relations if he and his wife were granted visitation.
 

 On cross-examination, Mr. Garner testified that he had two sons who, at times, would facilitate visits and who never encountered any problems with Mr. Thomas. When questioned about the alleged Social
 
 *787
 
 Service complaint against Mr. Thomas, Mr. Garner testified that he heard something about it, but that neither his wife nor his niece had anything to do with it. When questioned by the Court, Mr. Garner testified that neither he nor his wife filed a complaint, and he had no personal knowledge of a complaint. Mr. Garner admitted on cross-examination that when he was eighteen, forty years previously, he was “caught up in a charge that [he] didn’t have anything to do with”, and served a thirteen year sentence at Angola on that charge. He has had no legal problems since that time.
 

 Mr. Thomas testified that, during the ten years of his marriage, he had interactions with his wife’s parents. Before his wife’s illness, her parents would visit at Thanksgiving and at best two or three times a year. When his wife became | fiill, her mother visited her for two or three days. Mr. Thomas’ mother was retired and was living in his home, watching the boys and tending to their well-being while his wife was undergoing treatment for cancer. His mother cared for the family from Monday through Friday, and he cared for them on the weekends when he was not working.
 

 According to Mr. Thomas, after his wife’s death, in July of 2005, he brought the children to the Garners. He received a phone call indicating that MT was sick. The Garners took the child for treatment, but since they told him MT was really sick, Mr. Thomas picked up the child the next day.
 

 Mr. Thomas testified that from the time of his wife’s death to the time the Garners obtained court-ordered visitation, there was no problem with visitation. He contended that whenever the Garners called, he would allow them to see the children. According to Mr. Thomas, “[I]t got to the point where she began, you know, to demand to see them. And I was trying to explain to them that, you know, we were all grieving, and, you know, I needed to be with them and they needed to be with their dad.” He also testified that the Garners did not call at the time of their daughter’s death to offer to help with the funeral services.
 

 Mr. Thomas testified that after the Garners obtained court-ordered visitation, he brought the children to the Garners’ son because he “wasn’t allowed or whatever.... But, hey, you know, it was a rough time because, I mean, all this was happening.” The trial judge asked why he wasn’t allowed to deal directly to the Garners, and Mr. Thomas replied that,
 

 |7he did so because there was some type of hostility ... because my youngest son, who was maybe one at the time, was home with my mom. We were coming home, bringing my son home from school. And there were two ladies that had pulled up, and they said they were from Social Services. They wanted to ask, you know, a lot of questions and so forth. And they went ahead through the house, and they did whatever they had to do. And they questioned my son
 

 [[Image here]]
 

 The trial court interposed a hearsay ruling at that point, concluding Mr. Thomas’ testimony concerning the Social Services visit.
 

 Mr. Thomas then testified to the two visits that followed entry of the visitation order. He and the boys met the Garners at a shopping mall, and the first visit was uneventful. At the second visit, once again at the shopping mall, he confronted Mrs. Garner concerning her having taken some of his wife’s possessions from his home without his knowledge. He admitted on examination by the trial court that Mrs. Garner returned to him a ring that, he testified, held sentimental meaning for him, and that the only other item taken
 
 *788
 
 was a doll that had belonged to his wife. He testified that the children and Mr. Garner approached him “in a violent manner” and words were exchanged. He said his children were upset, and he did not want his children to see a confrontation between their grandparents and their father in a public place. He left the shopping mall with his children.
 

 After this confrontation, he arranged to have his brother-in-law facilitate future visits. In response to a question by the trial court, counsel for the Garners stated without contradiction that the Baton Rouge Family Courts’ consent order provided for the following:
 

 Visitation with the minor children on the 4th Saturday of March, 2006, to take place within the New Orleans/Metairie area, from 11:00 a.m. until 5:00 p.m. Darryl Thomas, Sr. is permitted to be present during said visitation, if he so chooses.
 

 | ^Visitation with the minor children on the 4th Saturday of June, 2006, to take place within New Orleans/Metairie area, from 11:00 until 5:00 p.m. Darryl J. Thomas, Sr....
 

 Visitation ... with the minor children on the 4th Weekend of September ..., to take place at Shirley Garner’s home (in Baton Rouge), commencing on Saturday at 11 o’clock a.m. and continuing until the following Sunday at 5:00 p.m. [Mr. Thomas was permitted to be present.] Visitation ... with the minor children ... on the weekend prior to Christmas, to take place at Shirley Garner’s home (in Baton Rouge), commencing Saturday at 11:30 a.m. and continuing until the following Sunday at 5:00 p.m. [Mr. Thomas was permitted to be present, and could spend the night.]
 

 Quarterly visitation in June, September and December of 2006, and in March, June, September and December of 2007 was to continue in the same form.
 

 Mr. Thomas described the children’s normal routine as going to a toy store, going to the park to play basketball and football, going bowling, to child-oriented restaurants to play video games, and watching football games together. He testified that DTJ participates in the gifted program at a demanding charter school, spends hours doing homework, and is preparing to take entrance examinations for two selective public high schools. When questioned by the trial court, Mr. Thomas testified that his mother no longer lives at his home, but sees the boys every Friday.
 

 On cross-examination, Mr. Thomas admitted that, although he had testified that he did not want to hold back any visitation, he has made no contact with Mrs. Garner since December of 2007 to arrange for such visits. When questioned by the trial court as to the reason for this lack of contact, he said only that his children did not ask to visit their grandparents.
 

 RThe parties offered no documentary evidence, and rested on the testimony adduced at the hearing. The trial court assigned its reasons orally at the conclusion of the evidentiary hearing. Of particular significance is the trial court’s finding that Mr. Thomas’ testimony was, in the judge’s language, “disingenuous,” and that Mr. Thomas “appeared] to be going from one reason to the next why [he is] opposed to the request for more frequent visits with the grandparents.” This credibility determination lies at the heart of the court’s ruling. The trial court noted the lack of evidence to support Mr. Thomas’ suggestion that quarterly, rather than monthly, visitation would be in the children’s best interests. Mr. Thomas produced no evidence of drug activity, a Social Services complaint, or lack of proper care of the children by their grandparents. The trial
 
 *789
 
 court founds as facts that (1) the minor children maintained regular contact with both sets of grandparents prior to their mother’s death; (2) there were no problems before their mother died; (3) it is not a good thing for the children to have to go through a maternal uncle to visit their grandparents because their father does not want to talk to or call his wife’s parents; (4) little weight would be given to Mr. Garner’s isolated criminal conviction from the 1960s; and (5) Mr. Thomas’ failure to contact the Garners to arrange for court-ordered visitation for an extended period of time requires a judgment providing for specific hours during which they could exercise their visitation.
 

 In most child custody cases and, by analogy, in visitation cases, the trial court decisions are based heavily on factual findings.
 
 Palazzola v. Mire,
 
 08-0075 (La.App. 4 Cir. 1/7/09), 10 So.2d 748. It is well settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong,” and where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable 11 ninferences of fact should not be disturbed on review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Appellate courts must constantly have in mind that their initial review function is not to decide factual issues
 
 de novo.
 
 When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Where documents or objective evidence so contradict a witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a fact finder’s finding is based on its decision to credit the testimony of one or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.
 
 Rosell v. ESCO,
 
 549 So.2d 840, 844-845 (La.1989).
 

 Grandparental visitation is governed by La.Civ.Code art. 136 B and C, and LSA-R.S. 9:344 A. The Civil Code article provides in pertinent part:
 

 B. Under extraordinary circumstances, a relative, by blood or affinity, ... not granted custody of the child may be granted reasonable visitation rights if the court finds that it is in the best interest of the child. In determining the best interest of the child, the court shall consider:
 

 (1) The length and quality of the prior relationship between the child and the relative.
 

 (2) Whether the child is in need of guidance, enlightenment, or tutelage which can best be provided by the relative. 111 (3) The preference of the child if he is determined to be of sufficient maturity to express a preference.
 

 (4) The willingness of the relative to encourage a close relationship between the child and his parent or parents.
 

 (5) The mental and physical health of the child and the relative.
 

 C. In the event of a conflict between this Article and R.S. 9:344 or 345, the provisions of the statute shall supersede those of this Article.
 

 
 *790
 
 LSA-R.S. 9:344, entitled “Visitation rights of grandparents and siblings”, provides in pertinent part:
 

 A. If one of the parties to a marriage dies, ..., and there is a minor child or children of such marriage, the parents of the deceased ... party without custody of such minor ... children may have reasonable visitation rights to the ... children of the marriage during their minority, if the court in its discretion finds that such visitation rights would be in the best interests of the ... children.
 

 Mr. Thomas contends that the trial court judgment is legally erroneous because it violates his fundamental right to make decisions regarding the care, custody and control of his children. He relies on the United States Supreme Court’s opinion in
 
 Troxel v. Granville,
 
 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), in which the court struck down a Washington statute permitting any person to petition the court for visitation rights at any time and authorizing the court to grant such rights whenever such visitation may serve the best interest of the child. The court affirmed the decision of the Washington Supreme Court finding that the statute unduly infringes on the parental constitutional right to limit visitation of their children with third persons. The Supreme Court found that the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution protected a parental liberty interest in the care, custody and control of their minor children. The high court noted that the Washington statute was “breathtakingly | abroad”, with language that effectively permits any third party seeking visitation to subject any decision by a parent concerning visitation of the parent’s children to state-court review and places the best-interest determination solely in the hands of the judge.
 
 Troxel v. Granville,
 
 530 U.S. at 67, 120 S.Ct. at 2060-61. The court noted that there had been no allegation or finding that the surviving parent was unfit, justifying the presumption that fit parents act in the best interests of their children. The court noted that the problem was not that the Washington court intervened, but that it gave no special weight at all to a mother’s determination of her children’s best interests, and placed on this fit custodial parent the burden of disproving that visitation would be in the best interest of the children. The court noted:
 

 Because we rest our decision on the sweeping breadth of [the Washington statute] and the application of that broad, unlimited power in this case, we do not consider the primary constitutional question passed on by the Washington Supreme Court — whether the Due Process Clause requires all nonpa-rental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation. We do not, and need not, define today the precise scope of the parental due process right in the visitation context. In this respect, we agree with Justice KENNEDY that the constitutionality of any standard for awarding visitation turns on the specific manner in which that standard is applied and that the constitutional protections in this area are best “elaborated with care.”
 
 Post,
 
 at 2079 (dissenting opinion). Because much state-court adjudication in this context occurs on a case-by-case basis, we would be hesitant to hold that specific nonparental visitation statutes violate the Due Process Clause as a
 
 per se
 
 matter, [citing in Footnote,
 
 inter alia,
 
 La. R.S. 9:344 (West Supp.2000) and La.Civ.Code Art. 136 (West Supp.2000). [Emphasis in original.]
 

 Troxel v. Granville,
 
 530 U.S. at 73, 120 S.Ct. at 2064.
 

 
 *791
 
 |13The court cited as examples of such hesitation,
 
 inter alia,
 
 the interpretation of the best-interest standard in Maryland’s grandparent visitation statute to require the court’s consideration of certain factors, citing
 
 Fairbanks v. McCarter,
 
 330 Md. 39, 49-50, 622 A.2d 121, 126-27 (1993).
 

 Louisiana’s First Circuit Court of Appeal has upheld the constitutionality of Louisiana’s grandparental visitation statute. See,
 
 Barry v. McDaniel,
 
 05-2455 (La.App. 1 Cir. 3/24/06), 934 So.2d 69 See also,
 
 Galjour v. Harris,
 
 00-2696 (La.App. 1 Cir. 3/28/01), 795 So.2d 350, where the court considered the
 
 Troxel
 
 opinion and found it inapplicable to the Louisiana statutory provisions for grandparental visitation. The court held: The Louisiana and United States Supreme Courts denied writs in the
 
 Galjour
 
 case
 
 [5]
 
 .
 

 First, unlike the Washington statute determined to have been unconstitutional in
 
 Troxel,
 
 La.R.S. 9:344 is more narrowly drawn. The Louisiana legislature has determined that in specified, limited situations, i.e., where one parent dies, is interdicted, or incarcerated, the
 
 parents
 
 of the deceased, interdicted, or incarcerated party
 
 may
 
 have
 
 reasonable
 
 visitation rights with the children
 
 provided
 
 the court finds said visitation to be in the best interest of the child. Unlike the Washington statute, the Louisiana legislature expressly limited the scope of La.R.S. 9:344 to the parents of the deceased or absent parent. Additionally, the statute’s grant of visitation does not contemplate a significant intrusion upon the child’s relationship with the other parent or interference with said parent’s fundamental right to make childrearing decisions.
 

 Galjour v. Harris,
 
 00-2696 at p. 11, 795 So.2d at 358.
 

 In Huber v. Midkiff,
 
 02-0664 (La.2/7/03), 838 So.2d 771, the Louisiana Supreme Court rejected a challenge to the constitutionality of our grandparental | uvisitation statute on procedural grounds. In that case, as in the case at bar, the party contesting the statute’s unconstitutionality did not comply with LSA-R.S. 13:4448’s requirement that prior to adjudicating the constitutionality of a Louisiana statute, the attorney general shall be notified by certified mail of the proceeding at, at his discretion, he shall be allowed to represent the state’s interest. Furthermore, it does not appear that the constitutional issue was raised and addressed in the trial court. While the facial constitutionality,
 
 vel non,
 
 of the Civil Code article and statute are not before us, Mr. Thomas calls upon us to consider whether his constitutional due process rights have been violated by the trial court’s application of the article and statute by the trial court in this case.
 

 A proper interpretation of LSA-R.S. 9:344 requires the trial court to balance the statute against a fit parent’s constitutionally protected fundamental right of privacy in child rearing and to remember that any rights of nonparents are ancillary to those of a fit parent. Furthermore, the nonparent has the burden of proving visitation or a modification of visitation would be reasonable and in the best interest of the child, as is required by the statute.
 
 Barry v. McDaniel,
 
 05-2455 at p. 10, 934 So.2d at 76, citing
 
 Babin v. Babin,
 
 02-0396 (La.App. 1 Cir. 7/30/03), 854 So.2d 403, 410-411,
 
 writ denied,
 
 03-2460 (La.9/24/03), 854 So.2d 338,
 
 cert. denied
 
 
 *792
 

 sub nom. Babin v. Darce,
 
 540 U.S. 1182, 124 S.Ct. 1421, 158 L.Ed.2d 86 (2004).
 

 We are guided by the principle that the trial court is in the best position to ascertain the best interest
 
 of
 
 the child, given each unique set of circumstances.
 
 Barry v. McDaniel,
 
 05-2455 at p. 11, 934 So.2d at 77, citing
 
 Babin v. Babin,
 
 854 So.2d at 408. The trial court has vast discretion in child visitation matters, and its determination on the issue is entitled to great weight and will not be disturbed on appeal unless an abuse of discretion is clearly shown.
 
 Id.
 

 |1sWe recognize also the principles that the nonparent seeking a modification must prove that the proposed change in visitation would be reasonable and in the best interest of the child, and that visitation that unduly burdens parental rights would be unconstitutional, regardless of the provisions of statutory law. See,
 
 Wood v. Wood,
 
 02-0860, pp. 8-9 (La.App. 1 Cir. 9/27/02), 835 So.2d 568, 573. We recognize that the state’s interest in extended family relationships between children and non-parents must be compelling, narrowly drawn and not unduly intrusive of parental rights, so that the trial court must consider the presumption that Mr. Thomas acted in the best interest of his children, and some material weight must be given to that determination. See,
 
 Id.,
 
 02-0860, pp. 10-11, 835 So.2d at 575. However, given the trial court’s determination that Mr. Thomas’ testimony was disingenuous, we cannot say, from our review of the entire record, that the trial court violated Mr. Thomas’ due process rights in extending the Garner’s visitation rights.
 

 It is clear from the trial court’s reasons for judgment that the trier of fact took great care in determining the underlying facts. The trial judge participated actively in questioning the witnesses and enunciated the reasons supporting his judgment in detail. We are mindful of the fact that the trial court specifically found Mr. Thomas’ testimony to have been disingenuous. Therefore, even applying a presumption in favor of this father’s position as a fit parent, the weight of evidence offered by the grandparents clearly preponderates. Our review of the record in its entirety convinces us that the trial judge’s credibility determination is reasonable. Mr. Thomas’ testimony concerning the reasons why he refused to deal directly with the Garners and ultimately cut off all contact with them was equivocal at best. The trial court, with the opportunity to observe the witnesses’ demeanors, chose to label I^Mr. Thomas’ testimony as disingenuous, while accepting the Garners’ testimony. This credibility choice is reasonable in light of the record viewed as a whole and will not be disturbed on appeal.
 

 Mr. Thomas contends that the trial court committed legal error in rejecting his request for more limited visitation; in finding that maternal grandparental visitation is in the best interest of the children; and in finding that Mrs. Garner sustained her burden of proof. However, the testimony of the Garners, which was accepted by the trier of fact, clearly indicates that they wish to assist in the care and nurture of their deceased daughter’s children. The types of activities in which the children engaged when visiting the Garners were wholesome and contributed to the children’s development and to the building of an intergenerational bond among the grandparents and the children. There is no evidence that the children were in any way injured, either physically or psychologically, while visiting their grandparents. Indeed, when Mr. Thomas delivered a sick child into their care, they brought the child to the hospital for immediate care, followed the medical advice given by the hospital staff, advised Mr. Thomas immediately of the situation, and
 
 *793
 
 cared for the child until Mr. Thomas came for his son sometime the next day. The record is devoid of evidence of any activities engaged in by the Garners and their grandchildren that could be considered detrimental, physically, emotionally, or psychologically, to the children. The Garners testified without contradiction that they would support and cooperate with the children’s extra-curricular participation and would ensure that homework assignments were monitored and completed during the children’s visits.
 

 While Mr. Thomas characterizes the trial court’s findings and rejection of his request for more limited visitation as “legal error”, essentially, they are factual |17findings, which are subject to the manifest error standard of review. As noted previously, the presumption that a fit parent has the right to determine issues such as visitation must be considered to have been overcome in this ease in light of the trial court’s rejection of Mr. Thomas’ testimony as disingenuous, and the record, considered in its entirety.
 

 We conclude from the record, taken as a whole, that the trial court was reasonable in rejecting Mr. Thomas’ request for more limited visitation and in finding that Mrs. Garner sustained her burden of proving that increased visitation was in the best interest of the children. It is clear that, while the trial court did not specifically advert in its orally assigned reasons for judgment to La. Civ.Code art. 136 B, the codal standards underlie the award of monthly visitation to the Garners.
 

 Article 136 B requires consideration of the length and quality of the prior relationship between the child and the relative. All parties testified that the relationship between the Garners and their grandchildren existed since the boys’ birth. As to the quality of the prior relationship between the Garners and the children, the grandparents testified to regular visits pri- or to their daughter’s illness, and to more intense babysitting and nurture of the children during her last illness. The trial court found as a matter of fact that the children maintained regular contact with both sets of grandparents prior to their mother’s death. Mr. Thomas’ testimony significantly reducing the frequency of the grandparents’ contact prior to Mrs. Thomas’ death was rejected by the trial court, and we will not disturb that reasonable credibility determination.
 

 The article requires consideration of whether the child is in need of guidance, enlightenment, or tutelage which can best be provided by the relative. The trial court found that the children’s best interest would be met by ending the 11speriod of discord between the Garners and Mr. Thomas and beginning a period of predictable communication among the members of the family. The trial court also noted that the Garners’ visits would be conditioned on their making sure the children continued to participate in their ongoing extra-curricular and sports activities and included Mr. Thomas in those activities. Furthermore, the court required the children to produce on Fridays at 6 in the evening their homework assignments in order that the Garners could deliver the children back to their father on Sundays at 6 in the evening with the assurance that they had been advised of the children’s assignments and that the children had completed those assignments.
 

 The children did not express a preference as to the frequency of grandparental visitation. The Garners expressed in their testimony the sort of willingness to encourage a close relationship between the children and their father contemplated by the code article. Mr. Garner testified that he treated Mr. Thomas as a son, and never had cross words with him prior to Mrs.
 
 *794
 
 Thomas’ death. He referred to Mr. Thomas as a good father, and noted that there had never been any problems among Mr. Thomas and Mr. Garner’s two sons. There is no indication in the grandparents’ testimony of negative
 
 animus
 
 toward Mr. Thomas, nor of any intention to discourage the children’s relationship with their father.
 

 The final codal consideration, the mental and physical health of the child and the relatives, appears to have been met as well. There is no indication that the children have any physical or mental problems. The evidence of their playing active sports and of the older child’s participation in the gifted program at a highly-regarded local school indicates to the contrary, that the children are in excellent physical and mental health. Mr. Thomas has provided no evidence of mental or physical deficiencies on the part of either Mr. or Mrs. Garner. The trial court was treasonable in refusing to consider Mr. Garner’s felony conviction of over forty years ago, and as to which he had paid his debt to society, to make him unfit for visits with his grandchildren.
 

 The court having considered the record, taken as a whole, including the testimony of the three witnesses, and the trial court’s reasonable credibility evaluations and findings of fact, we affirm the judgment of the trial court.
 

 AFFIRMED.
 

 [1]
 

 . Out of respect for the children’s privacy, they will be referred to herein as DTJ and MT.
 

 [2]
 

 . The Gamers are domiciled in Baton Rouge, Louisiana.
 

 [3]
 

 . Following Mrs. Thomas' death, Mrs. Gamer filed in Family Court in and for the Parish of East Baton Rouge a motion pursuant to La. Civ.Code art. 136 and LSA-R.S. 9:344 A for grandparent visitation. The Family Court proceedings were not introduced into the record in the district court, nor were any judgments of the Family Court made executory in Orleans Parish. As a Court of Record, we are unable to consider evidence not introduced and admitted in the trial court.
 

 [4]
 

 . The material within the quotation marks in this outline of testimony taken at the rule hearing is taken from the hearing transcript.
 

 [5]
 

 .
 
 Galjour v. Harris,
 
 01-1238 (La.6/1/01), 793 So.2d 1229;
 
 Galjour v. Harris,
 
 02-1273 (La.6/1/01), 793 So.2d 1230;
 
 Harris
 
 v.
 
 Galj-our,
 
 534 U.S. 1020, 122 S.Ct. 545, 151 L.Ed.2d 422 (2001).